ST. PAUL MERCURY INSURANCE COMPANY, AN
INSURANCE CORPORATION, APPELLEE
AND CROSS-APPELLANT, V.
JOHN P. HURST AND WILLIAM A. MIMICK, APPELLANTS
AND CROSS-APPELLEES, AND
MARK BOETTCHER AND WEERTS-BOETTCHER COMPANY,
APPELLEES AND CROSS-APPELLEES.

301 N.W.2d 352

Filed January 30, 1981. No. 43291.

Michael C. Washburn of Erickson, Sederstrom, Leigh, Johnson, Koukol & Fortune, P.C., for appellant Hurst.

Frank J. Skorupa for appellant Mimick.

Jewell, Otte, Gatz, Collins & Domina for appellee St. Paul Mercury Ins. Co.

William H. Grant of Albert, Leininger & Grant for appellees Boettcher and Weerts-Boettcher Co.

Heard before KRIVOSHA, C.J., McCOWN, WHITE, and HASTINGS, JJ., and MURPHY, District Judge.

KRIVOSHA, C.J.

The instant appeal arises out of a declaratory judgment action filed by the appellee St. Paul Mercury Insurance Company (St. Paul) to determine whether a policy of insurance sold to William A. Mimick (Mimick) was properly canceled for nonpayment of premium and therefore not in force and effect at the time Mimick was involved in an automobile accident with John P. Hurst (Hurst). Appellants Mimick and Hurst joined Mark Boettcher (Boettcher) and Weerts-Boettcher Company (Weerts Co.) as additional parties, claiming that if in fact the policy had been canceled, it was due to the negligence of the insuring agent, Weerts Co., and their employee, Boettcher. The trial court found generally for St. Paul and Boettcher and Weerts Co. We concur with the trial court's decision and affirm the judgment.

On February 27, 1976, Mimick's wife called Boettcher and asked to purchase a policy of insurance on a 1966 pickup her husband owned. There is some dispute as to whether Mrs. Mimick sufficiently advised Boettcher of Mimick's past driving record, including a conviction for driving while intoxicated. Boettcher then proceeded to complete an application with a company other than St. Paul, signing the application himself in the name of William Mimick and sending it to the company for processing. The company rejected the application because of Mimick's unsatisfactory past driving record. Boettcher proceeded then to fill out an application with St. Paul, once again signing the application himself in Mimick's name and sending the applica-

tion to St. Paul for processing. The initial premium of $146.40 was advanced by Boettcher on a check of Weerts Co. The rate as computed by Boettcher was for a classification which did not include a conviction for driving while intoxicated. Had there been such a conviction, the premium would have been higher. Thereafter, the policy was issued and sent to and received by Mimick. The policy covered a 6-month period from March 1, 1976, to September 1, 1976.

At the time the policy was sent to the Mimicks, St. Paul requested of the Department of Motor Vehicles the driving record of Mimick. Due to some confusion with regard to the correct driver's license number of Mimick, the information was not obtained immediately. After receiving a corrected driver's license number for Mimick, St. Paul ran a second record check and the motor vehicle report revealed the conviction of driving while intoxicated on November 9, 1974. As a result of that, St. Paul recomputed the premium based upon a rate which included a conviction for driving while intoxicated. The information was sent to Mimick by note dated June 9, 1976. Thereafter, on June 11, 1976, an amended declaration sheet was prepared by St. Paul, advising Mimick to make payment of an additional premium in the amount of $87.30 by July 1, 1976. When the additional premium was not received within 5 days after due, a followup notice was sent to the Mimicks. Mimick did not make any response and did not pay the additional premium.

A notice of cancellation was then sent by certified mail, return receipt requested, to the Mimicks on or about July 22, 1976. Again, no payment was made by the Mimicks. The notice of cancellation which was sent by certified mail, return receipt requested, signed by Constance Mimick, read as follows: "YOU ARE HEREBY NOTIFIED IN ACCORDANCE WITH TERMS AND CONDITIONS OF THE ABOVE MENTIONED POLICY THAT YOUR INSURANCE WILL CEASE EFFECTIVE AUG. 8, 1976 AT 12:01 AM

STANDARD TIME, BECAUSE OF NON-PAY-MENT OF AN ADDITIONAL PREMIUM DUE. ANY PREMIUM REFUND WILL BE DELIVERED TO YOU THROUGH YOUR AGENT." The evidence discloses that notwithstanding all of the notices given by St. Paul to the Mimicks, including the notice of cancellation referred to above, the Mimicks made no effort to contact either St. Paul or Weerts Co. and made no effort to pay the additional premium or to determine from either St. Paul or Weerts Co. why the premium was required. Mimick simply ignored everyone and everything.

On August 26, 1976, Mimick had an accident with Hurst, and it is that accident for which Mimick sought coverage under the St. Paul policy.

Mimick and Hurst have assigned a number of errors. The principal errors, however, are that the trial court erred in finding that the failure of Mimick to pay the increased premium was the cause of the cancellation and in not finding that the negligence of Boettcher and Weerts Co. was the proximate cause of the cancellation of the insurance policy.

Their argument with regard to the negligence of Boettcher and Weerts Co. apparently is founded on the notion that if improper information was given to the company by the agent, the insured should not be held accountable for it, citing several Nebraska decisions, including *Roth v. Employers Fire Ins. Co.*, 123 Neb. 300, 242 N.W. 612 (1932). In making that argument, however, Mimick and Hurst fail to note several important factors. St. Paul did not attempt in this case to cancel the policy but only to collect the proper premium. There is no evidence to indicate that the premium as ultimately computed by St. Paul is not exactly the same premium which would have been due had the information correctly been given to St. Paul in the first instance. Moreover, St. Paul was not attempting to avoid liability and cancel the policy because of the absence of certain information. St. Paul was simply

attempting to collect the proper premium it would have charged all other persons under similar circumstances. Moreover, it attempted to collect that premium in advance of canceling the policy and well in advance of the date on which the accident occurred.

Also, Mimick and Hurst argue that St. Paul may not change the terms of a policy due to a misrepresentation or false statement in an application caused by its own agent. St. Paul here was not attempting to change the terms of the policy; the coverage remained the same, as did the premium due, under the admitted facts.

The evidence is without contradiction that the Mimicks knew and understood that the premium quoted was subject to verification. The evidence discloses the following testimony by Mrs. Mimick:

"Q. So that you generally knew that companies, after they agree to accept an insurance policy, they sometimes then, after they check the motor vehicle records, that they say they can't take the policy?

. . . .

"A. I know that because it happened to Bill before.

"Q. And you did know at the time of this request for insurance that insurance companies did check the motor vehicle records of applicants for insurance?

"A. Yes.

"Q. And you also knew that after checking the motor vehicle records of an applicant for insurance that they might increase the premium or lower the premium, didn't you?

"A. Yes.

"Q. And you knew this at the time you made this application for this insurance on the pickup?

"A. At the time I made the phone call, yes."

The simple fact of the matter is that the policy in this case was canceled because of the nonpayment of premium and for no other reason; and the evidence is without dispute that although the Mimicks knew they might be required to make an additional premium payment,

they took no action with regard to the notice, including contacting Boettcher. St. Paul had a right to collect the proper premium, and no one was entitled to insist on coverage absent the payment of a proper premium when called upon to make it in advance of cancellation. The consideration for St. Paul's providing coverage was the payment of the premium. Absent that payment, St. Paul was under no obligation to furnish coverage and was authorized to cancel the policy.

"The regular payment of premiums is of the very essence of an insurance contract. Such payment being of the very essence and substance of a policy, it has been stated that even a court of equity cannot grant relief for failure to comply with the explicit and stipulated requirements of the policy setting up conditions precedent to the granting of any relief. Ordinarily, therefore, a court of equity will not relieve against a forfeiture incurred by the nonpayment of a premium.

"The burden is on an insured to keep a policy in force by the payment of premiums, rather than on the insurer to exert every effort to prevent the insured from allowing a policy to lapse through a failure to make premium payments. The continuance of the insurer's obligation is conditional upon the payment of premiums, so that no recovery can be had upon a lapsed policy, the contractual relation between the parties having ceased." 14 Appleman, *Insurance Law and Practice*, § 8072 at 381 (1944). The trial court was correct in finding that St. Paul had properly notified the Mimicks of the requirement to pay an adjusted premium and, upon their failure to do so, was entitled to cancel the policy.

We must, likewise, reject the claim of Mimick and Hurst that if St. Paul was entitled to cancel the policy, Boettcher and Weerts Co. were then negligent in permitting the cancellation to occur, which negligence was the proximate cause of Mimick's loss. While it may be true that an appropriate premium would have been computed had Weerts Co. provided all of the necessary information to St. Paul in the first instance, it is clear

that the proximate cause of the policy being canceled in this instance was not any information given or not given by the agent to St. Paul but, rather, Mimick's failure to respond to the additional premium notice and to the subsequent notice of cancellation. As we noted in the case of *Travelers Indemnity Co. v. Center Bank*, 202 Neb. 294, 299, 275 N.W. 2d 73, 76 (1979): "For there to be an action for negligence, the alleged act must be the proximate cause of the injury suffered. 'Proximate cause,' as used in the law of negligence, is that cause which in the natural and continuous sequence, unbroken by any efficient intervening cause, produces the injury and without which the injury would not have occurred. Warren v. Bostock, 170 Neb. 203, 102 N.W.2d 55. Even where conduct is negligent, it is still required that the conduct be a substantial factor in bringing about the harm. Causation in this sense inevitably involves the idea of responsibility. It is not enough that the harm would not have occurred had the individual defendant not been negligent. [Citation omitted.]"

While we make no determination as to whether Boettcher and Weerts Co. were negligent in failing to advise St. Paul about Mimick's conviction when the application was first sent in, even if we were to find them negligent we are unable to see how their negligence proximately caused Mimick's loss in the instant case.

It seems clear beyond question that the failure of Boettcher and Weerts Co. to provide St. Paul with information concerning Mimick's conviction of driving while intoxicated was not the proximate cause of the policy being canceled. The proximate cause of the cancellation was Mimick's failure to pay the premium after receiving repeated notices. Nothing more can be made of that fact. The trial court correctly viewed the situation in deciding the case. Having so disposed of the appeal, we need not consider any other assignments of error raised by Mimick and Hurst.

AFFIRMED.